IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Andrew Nolen, | Case No. 3:17 CV 182 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Ohio Department of Rehabilitation and Correction, | |
| Defendant. | |

Defendant Ohio Department of Rehabilitation and Correction (ODRC) moves for summary judgment (Doc. 28); Plaintiff Andrew Nolen opposes (Doc. 31). This Court held a Record Hearing in September 2018, with questions submitted to counsel in advance (Doc. 33). Following the hearing, both parties submitted supplemental briefs (Docs. 36, 37).

### BACKGROUND

Nolen began his career as a corrections officer with ODRC in 1997. The following year, Nolen was assigned to Marion Correctional Institution, where he remained for almost two decades. In September 2003, Nolen's newborn son was diagnosed with spinal muscular atrophy -- a permanent medical condition that interferes with motor function and muscle movement (Doc. 31 at 5). To this day, Nolen's son must use a power wheelchair to move around, he cannot sit up on his own, and he must be observed while eating because he cannot swallow correctly (*id.*). During the nighttime, he needs someone to manually lift him into bed and adjust him periodically throughout the night (*id.* at

11–12; Doc. 26 at 289). In the mornings, he needs someone to lift him from bed and put him into his power chair (Doc. 26 at 242).

After his son's diagnosis, Nolen began taking leave under the Family Medical Leave Act (FMLA) to care for his son. He took two months of leave in the immediate wake of the diagnosis and continued to take leave intermittently, as his son's medical needs required. From 2005 through 2016, Nolen filed annual certifications with ODRC for authorization to take FMLA leave (*see, e.g.*, Doc. 26-44; *see also* Doc. 26 at 48).

Like any prison, Marion Correctional Institution requires staff on site twenty-four hours a day, so officers and lieutenants work in shifts. The first and second shifts occur during the daytime, and the third shift takes place overnight. From 2010 to 2014, Nolen worked on third shift (*see* Doc. 26 at 28; Doc. 26-18 at 1). During that period, Nolen's wife and daughters were able to provide nighttime and morning care for Nolen's son. Within that same timeframe, Nolen began taking on additional responsibilities, joining special units like the hostage negotiation team and the security threat group (Doc. 26 at 23–24). Being a member of these units required him to attend occasional trainings and meetings away from the prison during work hours (*id.* at 294–95). Although these trainings and meetings meant time spent away from Nolen's regular duties, they still counted as hours Nolen spent working for ODRC (*id.*). Anytime Nolen needed to attend an event offsite for one of these special units, he obtained advance approval from his superiors (*id.* at 294).

In 2013, Nolen began reporting to Major Samuel Grisham. In Nolen's first performance review with Grisham, Grisham cautioned Nolen to "[w]atch [his] attendance" (Doc. 26-17 at 3). Nolen asserts that, around that time, he had no attendance issues other than his FMLA leave to care for his son (Doc. 31 at 7). In 2014, a lieutenant position became available, and Grisham encouraged Nolen to apply (Doc. 26 at 81). Nolen assumed he would not get the job because of how often he

2

needed to take leave to care for his son (*see id.*). But Grisham told Nolen that he should "stop using [his son] as a crutch" and apply for the job (*id.*). In April 2014, Nolen was promoted to lieutenant (Doc. 26-1 at 1), and in January 2015, he began working on second shift (Doc. 27-13 at 5).

A few weeks later, Nolen took three days of FMLA leave to care for his son while he was sick (Doc. 26 at 278). When Nolen returned to work, he was called into a meeting with Captains Pamela McBride and Edward Bernardo (*id.*). During this meeting, Nolen claims he was told Grisham wanted him fired because of his FMLA use (*id.* at 279). In March 2015, Nolen again took leave to take his son to a doctor's appointment. That day, Grisham sent Nolen an email, asking him not to take off an entire shift on short notice (Doc. 26-27 at 1). Later that year, in a meeting between Nolen and Grisham, Grisham confirmed the earlier rumors -- according to Nolen, Grisham said he was trying to fire Nolen because of his FMLA use (Doc. 26 at 196–98).

In February 2016, Nolen had another performance review. In the manager-comments section, Grisham wrote, "I challenge Andrew to be more of an [sic] positive example by working hours scheduled as he holds his staff accountable for the same actions" (Doc. 26-40 at 5). In the employee-comments section, Nolen responded, saying Grisham's comment was "an obvious attempt at addressing the use of FMLA hours" (*id.*). Nolen said, "[D]ue to my situation at home with my son[,] I may have to take care of him at a moment[']s notice" (*id.* at 5–6). Nolen added that, by that point, it had been "almost a year" since he last took FMLA leave and all his leave had been "approved by direct supervisor in advance" (*id.* at 6). Grisham did not respond to Nolen's comment, and another supervisor ultimately signed off on Nolen's performance review (*id.*).

Just nine days after Nolen's comment, Grisham sent an email announcing that, in two days, Nolen will move to third shift and another lieutenant -- Lieutenant Thomas -- will move to second (*see id.*; Doc. 26-41 at 2). Nolen responded that he needed to be on second shift so that he could

3

provide nighttime and morning care for his son (*id.*). Although Nolen had previously been able to work on third shift, Nolen's daughters had since moved out of the house and Nolen's wife had a back injury that made it difficult for her to lift their son (*id.* at 1; Doc. 26 at 288). When Nolen was on second shift, he would do all the lifting in the morning and night, moving his son in and out of the power chair, and Nolen's wife would care for him throughout the day (Doc. 26 at 288–89). Nolen told Grisham that, on third shift, he would be unable to provide this necessary care (*see* Doc 26-41 at 1–2).

The shift transfer was delayed a few weeks but ultimately took effect in March 2016 (Doc. 26-42 at 1; Doc. 27-13 at 11). The following month, Grisham retired (Doc. 23 at 49). Nolen asked his supervisors whether he could move back to second shift, but he was told to wait until Grisham's replacement was hired (Doc. 26 at 31–32). Finally, in June 2016, Nolen was called for a meeting with Warden Jason Bunting and Captain Dan Straker. There, Bunting advised, "[S]o long as I'm a warden here at Marion Correctional, you'll be on third shift" (*id.* at 58). Straker then said, "[Y]ou heard the warden . . . because of your attendance, I'm not going to put you back on second" (*id.* at 59).

To Nolen, this meant he was stuck on third shift permanently (*id.* at 293). In June 2016, Nolen gave his two-weeks' notice (Doc. 26-45). Nolen had been on third shift for three months by that point and had not attempted to take any FMLA leave (Hrg. Tr. at 17–18). His last day of work was July 8, 2016 (Doc. 26-45). In his resignation notice, next to "Reason of Resignation," Nolen wrote that he "needed to care for [his] disabled child" (*id.*).

## LEGAL STANDARD

Under Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." This burden

4

"may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When considering a motion for summary judgment, this Court draws all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). This Court does not weigh the evidence or determine the truth of any matter in dispute; rather, it determines only whether there is sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

**FMLA Interference Claim**

The FMLA entitles qualified employees to take up to twelve weeks of unpaid leave annually, without fear of termination, when that leave is taken to care for a family member with a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" the right to take this leave. 29 U.S.C. § 2615(a)(1). If an employer interferes with this right, an employee can sue. 29 U.S.C. § 2617(a)(2). Here, to prevail on his interference claim, Nolen must establish: (1) he is eligible for FMLA benefits; (2) ODRC is an employer subject to FMLA requirements; (3) Nolen was entitled to leave under the FMLA; (4) Nolen gave ODRC notice of his intention to take leave; and (5) ODRC denied Nolen the FMLA benefits to which he was entitled. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2008).

Here, the central dispute is the fifth element -- whether ODRC denied Nolen benefits (*see* Doc. 28 at 19–20). ODRC argues Nolen "cannot establish an FMLA interference claim, because . . . he was never denied the use of FMLA for over 10 years before his voluntary resignation" (*id.* at 20).

5

Nolen concedes ODRC never directly denied any of his leave requests; instead, he tries to meet this element by way of a discouragement theory. *See* 29 C.F.R. § 825.220(b). To establish the fifth interference element through a discouragement theory, Nolen must show that either (1) he "tried to assert h[is] FMLA rights and was discouraged," or (2) ODRC's "actions would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise h[is] FMLA rights." *Vess v. Scott Med. Corp.*, 2013 WL 1100068, at *2 (N.D. Ohio 2013). *See also Golden v. New York City Dep't of Envtl. Prot.*, 2007 WL 4258241, at *3 (S.D.N.Y. 2007). Under either prong, however, Nolen "must put forward evidence that [ODRC] actually interfered with h[is] FMLA leave." *Vess*, 2013 WL 1100068, at *2. He must show that ODRC's conduct, in fact, caused him to refrain from requesting or using FMLA leave. *Bonfiglio v. Toledo Hosp.*, 2018 WL 5761220, at *12 (N.D. Ohio 2018).

Nolen focuses on the objective prong and argues the totality of ODRC's actions created an atmosphere that would discourage a person of ordinary resolve from exercising FMLA rights (Doc. 31 at 17–18). Nolen cites several examples of actions that contributed to this discouragement, including Grisham's repeated comments about attendance, his statement that he wanted Nolen fired because of FMLA use, Grisham's knowledge that a third shift assignment would make it more difficult for Nolen to care for his son, Grisham's decision to move Nolen to third shift, and Bunting's decision to make that move permanent (*id.*).

At the September hearing, Nolen's counsel argued these circumstances would discourage reasonable employees from exercising FMLA rights due to fear that, if they took FMLA leave, ODRC would make antagonistic changes to their work schedules or fire them (Hrg. Tr. at 10–11). For causation, counsel acknowledged the record lacks direct evidence that Nolen "would have taken leave on X day, but . . . was discouraged" (Hrg. Tr. at 19–20). Instead, he points to timing: "[A]fter

6

[Grisham's] comments . . . [Nolen] essentially stopped taking FMLA leave all together" (Hrg. Tr. at 19–20).

When determining whether a reasonable person in Nolen's situation would be dissuaded from taking leave, "[c]ontext matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (citation omitted).

By early 2016, Nolen had been taking intermittent FMLA leave for over a decade, and he knew the law entitled him to that leave (*see* Doc. 26 at 279; Doc. 26-40 at 5). In all that time, he had never been denied an FMLA leave request (Hrg. Tr. at 18). For several years during that time, Nolen worked on third shift. Now, when Nolen found himself back on third shift, all that experience suggests he would not hesitate to request leave. Yet he did not ask to take leave for over a year before his resignation (*see* Doc. 26-40 at 5–6). Is that because he was discouraged? Or is that because he simply did not need to take leave during that time?

Nolen argues he was discouraged by Grisham's comments, but those comments must be taken in context. This Court takes as true Nolen's assertion that Grisham wanted to fire Nolen for taking leave -- a fact Grisham denies (Doc. 23 at 32–33). But, as Nolen tells it, when he first heard that comment, he also knew Captain McBride had told Grisham, "Sam, you can't do that. That's FMLA." (Doc. 26 at 279). Further, in the performance review, which was viewed by numerous supervisors, Nolen showed no concern about pushing back on Grisham's attendance comment, calling it an "obvious attempt at addressing the use of FMLA hours" (Doc. 26-40 at 5–6). Regardless of what Grisham may have wanted to do, Nolen offers no evidence that he actually feared he would be fired if he took FMLA leave.

7

Nolen also argues he was discouraged from taking FMLA leave by the shift transfer, but he does not explain how. Assuming Nolen truly needed to be home at night to care for his son, then a person of ordinary resolve in his situation would have been more likely to take FMLA leave on third shift than on a daytime shift. At the time of his shift transfer, Nolen was nowhere near his annual twelve-week limit on FMLA leave, yet he did not ask to take FMLA leave during the three months he was on third shift (Hrg. Tr. at 9–10, 17–18; *see also* Doc. 27-13). A transfer to inconvenient working hours may have constituted retaliation for earlier leave he had taken (discussed below), but it did not discourage him from taking more FMLA leave.

The weakness in Nolen's discouragement theory is highlighted by what happened after Grisham retired -- two months before Nolen's resignation. If Grisham was such a contributor to Nolen's discouragement, one would think Nolen would have taken FMLA leave after Grisham's retirement. Instead, with his main antagonist off the scene, Nolen simply "tried to make it work for a period of time" on third shift, until he decided to resign (Hrg. Tr. at 18).

Nolen offers no evidence of need to take FMLA leave during his last few months of employment. And by his own admission, he did not need any leave for the year between March 2015 and February 2016. As noted in his February 2016 performance review, "Due to my situation at home with my son[,] I may have to take care of him at a moment[']s notice. This being said[,] my son has not been sick since the last time I had called off[,] which [was] almost a year" ago (Doc. 26-40 at 5–6).

Nolen has not shown that a person of ordinary resolve in his situation would have been discouraged from taking leave because he has not shown that he needed to take leave in the first place. Evidence that Nolen stopped taking FMLA leave, without more, is insufficient to show ODRC's

8

actions interfered with his FMLA rights. Without sufficient evidence to meet the fifth element, Nolen fails to demonstrate a genuine dispute of a material fact on his interference claim.

**FMLA Retaliation Claim**

Nolen argues his discharge was in retaliation for taking FMLA leave. To establish an FMLA retaliation claim, Nolen must show: (1) he was engaged in an FMLA-protected activity; (2) ODRC knew he was exercising his FMLA rights; (3) after learning of his exercise of FMLA rights, ODRC took an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555–56 (6th Cir. 2006). Nolen bears the burden of demonstrating those elements. *Id.* at 556. Here, only the third and fourth elements are in dispute.

*Adverse Employment Action*

An adverse employment action is one that results in a "materially adverse change in the terms and conditions of [plaintiff's] employment," typically characterized "by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (citation omitted). Nolen claims his transfer to third shift constituted an adverse employment action because it amounted to a constructive discharge. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) ("Plaintiff may establish an adverse employment action by demonstrating that she was constructively discharged."). To demonstrate a constructive discharge, Nolen must show that (1) ODRC "deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and (2) ODRC did so "with the intention of forcing [Nolen] to quit." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

To determine whether an employer deliberately created intolerable working conditions, the Sixth Circuit looks for the following factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a retaliating supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *See Logan*, 259 F.3d at 569. This list of factors is not exclusive, and this Court may consider other appropriate factors as it sees fit. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (citing *Logan*, 259 F.3d at 570).

Here, Nolen argues one, and only one, of the enumerated factors is satisfied: there was an offer of continued employment on terms less favorable than Nolen's former status. Although *Logan* recites seven factors, it is unclear whether only one factor alone can suffice for a constructive discharge. But cases have held that a reasonable jury could find a constructive discharge where there is evidence of just one factor and that evidence is particularly severe. *See, e.g.*, *Festerman v. County of Wayne*, 611 F. App'x 310, 320–21 (6th Cir. 2015) (holding that evidence of "combined hostility from . . . officers and supervisors" created a triable fact question of objectively intolerable working conditions); *Benaugh v. Ohio Civil Rights Comm'n*, 278 F. App'x 501, 512 (6th Cir. 2008) (noting evidence of defendant's failure to provide reasonable accommodation was sufficient to create a triable fact question of objectively intolerable working conditions).

Nolen has produced sufficient evidence to satisfy the seventh factor. Grisham switched Nolen to third shift and insisted on the switch after Nolen explained the assignment would make it difficult for him to care for his disabled son (*see* Doc. 26-41). Nolen continued working for nearly three months in an attempt to wait out the transfer and save his job. Then, only after Bunting permanently

10

ratified Grisham's act, did Nolen resign (Doc. 26 at 293). A reasonable jury could find that a permanent transfer to third shift, where the timing of that shift prohibited Nolen from providing the nighttime care his son required, amounted to the creation of intolerable working conditions.

As for the employer's intention, Nolen has produced evidence that this permanent shift transfer was calculated to encourage his resignation. Grisham allegedly wanted Nolen fired for his use of FMLA leave. Grisham, and other ODRC managers, knew this shift transfer would work a serious hardship on Nolen. Grisham announced the shift transfer just over a week after the contentious performance review, in which the comments centered around Nolen's attendance and use of FMLA. And a reasonable jury could find that Bunting's decision to make the transfer permanent was made with the intention of pushing Nolen out the door. This creates a genuine dispute whether the permanent shift transfer was an adverse employment action.

### *Causation*

For the fourth element, Nolen must establish a causal link between his use of FMLA leave and the adverse employment action. A plaintiff can establish causation by either direct evidence or circumstantial evidence. In the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See also Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991). "Although no one consideration is dispositive, '[a] causal link may be shown through knowledge combined with closeness in time.'" *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002) (alteration in original) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000)). Once a plaintiff establishes a prima facie case for causation, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. Plaintiff then must demonstrate "that the proffered reason was not the true

11

reason for the employment decision." *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Nolen has established a prima facie case of causation between his use of FMLA leave and the permanent shift transfer. Grisham put Nolen on third shift a mere nine days after he responded to Grisham's attendance comment in his performance review (*see* Doc. 26-40 at 5; Doc. 26-41 at 2). And Bunting made the shift transfer permanent "because of [Nolen's] attendance" (Doc. 26 at 59).

The burden shifts to ODRC to articulate a legitimate reason for the action. ODRC asserts Nolen's shift transfer was part of a larger personnel rotation, designed to give newly hired lieutenants training opportunities in the daytime shifts (Doc. 28 at 15). ODRC produced evidence to support this reasoning, including onboarding paperwork for two new lieutenants scheduled to begin work on February 21, 2016 -- the same day Grisham originally set for the effective date of Nolen's shift transfer (Doc. 37-1 at 4–7).

The burden then shifts back to Nolen to demonstrate that ODRC's proffered reason for the transfer was pretextual. Nolen points out that Grisham's email announcing the shift change merely flip-flopped two lieutenants -- Nolen was to move from second to third and Thomas was to move from third to second (Doc. 26-41 at 2). When asked how swapping two lieutenants created any additional daytime room for new recruits, Grisham responded, "Management reasons." (Doc. 36-2 at 11). None of the supplemental personnel documentation disproves Nolen's assertion -- that flip-flopping Nolen and Thomas had nothing to do with a larger change in personnel. A reasonable jury could find that ODRC's reason for the shift transfer was pretextual. It could infer that ODRC wanted the transfer to result in Nolen's resignation, and that ODRC accomplished its goal. This too creates a genuine issue of material fact.

## CONCLUSION

ODRC's Motion for Summary Judgment (Doc. 28) is granted in part and denied in part; summary judgment is granted on the interference claim and denied on the retaliation claim.

IT IS SO ORDERED.

                                        s/ *Jack Zouhary*
                                        JACK ZOUHARY
                                        U. S. DISTRICT JUDGE

                                        December 21, 2018